## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **UNITED STATES OF AMERICA** | Crim. No. 18-21 (KM) |
| **v.** | |
| | **OPINION** |
| **JESSE TULLIES and**<br>**EUGENE WILLIAMS** | |

This matter comes before the Court on the post-trial motion of the defendant, Jesse Tullies (DE 69), joined by his codefendant, Eugene Williams (DE 72), for a judgment of acquittal, pursuant to Fed. R. Crim. P. 29(c), or in the alternative for a new trial, pursuant to Fed. R. Crim. P. 33. I have considered the proffered grounds separately and in combination. For the reasons expressed herein, the motion will be denied.

### I.   Evidence[1]

### A. The prosecution case

The charges stemmed from the events of a single afternoon, October 4, 2017. An undercover officer saw the defendants engage in two sales of illegal narcotics. The officers apprehended one customer in possession of the heroin he had just purchased. They seized heroin and crack cocaine, as well as three loaded handguns, from a parked car that defendants used as a stash.

---

[1]   The trial transcripts (exclusive of jury selection) are paginated sequentially. Citations herein are therefore in the simple form "Tr. __."

The transcript volumes may be located in the record as follows:

Vol. 1, Transcript dated June 5, 2018 (DE 64) — pp. 1–98

Vol. 2, Transcript dated June 6, 2018 (DE 65) — pp. 99–365

Vol. 3, Transcript dated June 7, 2018 (DE 66) — pp. 366–555

Vol. 4, Transcript dated June 8, 2018 (DE 67) — pp. 556–647

The first witness, Detective Yusef Ellis of the Essex County Sheriff's Department, identified defendants Tullies and Williams as the persons he had seen conduct two hand-to-hand narcotics transactions on October 4, 2017. On that date, Det. Ellis testified, he was in Newark, on Weequahic Avenue near Clinton Place, conducting surveillance from an unmarked vehicle. He was alone, but in radio contact with backup officers nearby. Tullies and Williams, he testified, were two of three men he saw there.[2] (Tr. 158)

Det. Ellis saw a green Honda Civic pull up and saw the driver, a white male, speak to Tullies. (Tr. 159–60) Williams then walked up the driveway of 249 Weequahic Avenue and approached a Chevy Lumina with no license plates that was parked there. (Tr. 161–63, 211) He went to the rear bumper of the car, bent down, took out a clear plastic bag, removed some items, and replaced the bag under the car. (Tr. 164–65) He then walked back to the Honda Civic and handed the items to Tullies. Ellis could see that the items were glassine folds, commonly used to package heroin. (Tr. 166) Ellis saw Tullies hand the items to the driver of the Civic, and saw the driver give Tullies cash in exchange. The Civic then drove away. (Tr. 166–67)

An unidentified African-American woman then approached Tullies on foot. (Tr. 170–71) Tullies walked up the driveway of 249 Weequahic, as Williams had done earlier. (Tr. 171) Tullies reached under the rear bumper of the Chevy Lumina, took out a plastic bag, removed items from the bag, and replaced it under the bumper. (Tr. 172) Tullies then walked back to the unidentified woman. (Tr. 173) When Tullies opened his hand, Ellis again could see that the items were glassine folds. The woman handed Tullies cash, which he placed in his pocket. (Tr. 174) The woman then walked away. (Tr. 174–75)

Ellis radioed the backup officers and described where Tullies and Williams were standing. At this point, some five minutes had passed since the hand-to-hand transactions. (Tr. 177)

---

[2]    A third man, named Edwards, was eventually detained on an unrelated outstanding warrant. (Tr. 178) He plays no further part in this case.

Detectives Evans and Pearce appeared and arrested Tullies and Williams. (Tr. 178) When arrested, Tullies possessed $1275 in currency and Williams possessed $360 in currency. (Tr. 252–58)

Ellis radioed a brief description of the unidentified woman purchaser and the Civic driver to the backup officers. (Tr. 175–76) The unidentified woman was not found, but Detective Docke pulled over the green Civic nearby, on Lyons Avenue. (Tr. 304, 306) The driver was identified as John Potts. (Tr. 309) Potts surrendered two glassine envelopes of heroin, bearing the brand stamp "Black Jack." (Tr. 309–11) Docke radioed back to Ellis, reporting the results of the stop, and then drove to the Weequahic location. (Tr. 176–77, 311)

Ellis directed Detectives Ryals and Docke to the Chevy Lumina. (Tr. 178–79) Together they searched the Lumina and the surrounding area. (Tr. 235) From under the rear bumper of the car, Ryals personally recovered "jugs" (small plastic containers) of crack cocaine and a loaded handgun with ammunition. (Tr. 236–43, 317–18) Detective Docke recovered from under the bumper a bag containing glassine envelopes of heroin, rubber-banded in bundles of ten, and stamped with the brand name "Black Jack." (Tr. 243–47, 313–16) The brand-stamp "Black Jack" matched the stamp on the two envelopes seized from Potts. (Tr. 259–60) Docke also recovered from under the bumper two additional loaded handguns. (Tr. 247–52, 316–17)

The parties stipulated that the drugs were analyzed and found to consist of 3.714 grams of heroin and .563 grams of cocaine base. (Tr. 371–72) The guns were identified as a Beretta BU9, serial number NU068181; a Taurus Millennium PT111 G2, serial number TGU47186; and an FEG 9mm, serial number AG0726. (Tr. 343, 347–49, 354; GE 4, 5, 6) Agent Casanova of the Bureau of Alcohol, Tobacco, and Firearms confirmed that the seized guns were operable, that they fit the statutory definition of a firearm, and that the guns and ammunition were manufactured outside the State of New Jersey and hence had traveled in interstate commerce. (Tr. 332–58)

Agent Havens of the FBI testified in the capacity of an opinion witness on "methods used by drug dealers to conduct street-level drug business to include

3

the distribution, packaging, pricing, and storage of the drugs, and also the use of firearms in furtherance thereof." (Tr. 382) He described packaging of heroin in decks, bundles, and bricks, as well as the use of brand-name stamps; the packaging of cocaine base (crack cocaine) in jugs; prevailing prices in Newark; and related matters. Havens testified that street-level drug dealers will typically set up a territory, often on a quiet block, will protect that territory, and will generally permit only one brand to be sold within that territory. Transactions, he explained, are generally done in cash, and often in small bills, which may be traded in for larger bills at local businesses such as bodegas. The packaging of the drugs and the currency seized in this case, he opined, were typical. (Tr. 374–398) Havens testified that street-level dealers do not want to be caught in physical possession of drugs, so they typically stash them at a location which they can monitor. They then retrieve amounts as necessary for sales. To maintain deniability, the location would typically not be owned by or traceable to the dealer. The facts of this case, he opined, fit that pattern. (Tr. 398–401)

Havens testified further that guns are tools of the narcotics trade. They are used to protect the drugs and the territory, to defend against robbery, and to guarantee payment. Guns will sometimes be stashed with the drugs they are meant to protect; here, too, the dealer may want to avoid being caught in physical possession of a firearm. Once again, Havens testified that the pattern fit the facts of this case. (Tr. 401–04) Semi-automatic handguns like the ones seized here, he testified, are typical and well-suited to the purposes for which street-level drug dealers use them, such as defense, protection of the stash, or discouragement of robbery. (Tr. 404–06)

In the bifurcated second phase of the case, the government introduced a stipulation that each of the defendants had a prior, unspecified felony conviction. (Tr. 587–90, Tr. 636–39)[3]

---

[3]    Each defendant was charged with possession of a firearm by a person with a prior felony conviction. 18 U.S.C. § 922(g)(1). The evidence of those felon-in-possession charges was bifurcated so that the jury would not be prejudiced by knowledge of the

## B. The defense case

Leanna Travers, defendant Tullies's daughter, testified that on October 4, 2017, she went to Weequahic Avenue with her friend, Stephanie Davis. She went there to meet Tullies, who was to give her some money for work shoes. (Tr. 444–45, 449) Tullies pulled up in a car, got out, and walked toward a car that was parked behind the one in which Travers was sitting. Tullies spoke to two females, and then walked toward Travers's car, where Travers was still sitting. At that point the police arrived and blocked everybody in. (Tr. 445) Tullies was handcuffed and arrested. (Tr. 446)

Stephanie Davis testified that on October 4, 2017, she drove to Weequahic Avenue with Leanna Travers, her best friend. They parked and waited for Tullies. The car of Travers's cousin was parked behind them. (Tr. 435–37) Tullies pulled up in a light blue car and parked on the opposite side of the street. (Tr. 437–38) Multiple police cars with flashing lights then arrived, and the police took everyone's car keys. Tullies was handcuffed behind the Davis/Travers car and then placed in a police car. (Tr. 439) Asked on cross-examination why they went to Weequahic Avenue to look for Tullies, Davis agreed that it was the location where he usually hangs out. (Tr. 442)

John Potts, the driver of the green Civic, testified that he drove to Weequahic Avenue on October 4, 2017. A now-recovering heroin addict, he admitted that he went there to buy drugs. (Tr. 451) The persons who sold him

---

prior felony convictions when deliberating on the other counts of the Indictment. *See* pp. 7–8 & n.6, *infra*.

Before trial, however, the government moved *in limine* to admit evidence of three prior convictions of Tullies and one of Williams under Rule 404(b), Fed. R. Evid. All, said the government, were for drug dealing within one block of the Weequahic Avenue location, and would be offered to rebut any defense contention that defendants' presence was innocent or unknowing, or that they lacked criminal intent. (DE 38 at 6, 9) After an evidentiary hearing, I reserved decision, finding that admissibility would depend on the evidentiary context, and instructed the government to signal the court before attempting to introduce such evidence. (Tr. 86) As it turned out, the government did not renew its application to admit evidence of the circumstances surrounding the prior convictions, except in sanitized form in the bifurcated portion of the case. *See* p.8 & n.6, *infra*. So although counsel had it in mind, the jury did not hear it.

the drugs, he said, were not Tullies and Williams but "younger kids," whom he described as two skinny black males, 6 feet in height, around 18 to 20 years old. (Tr. 452–53) He testified that he recognized Tullies and Williams only from having been arrested with them.[4]

Dina Blackwell, who identified Tullies as her fiancé, testified. As for the $1275 possessed by Tullies, she stated that it was intended for a rental deposit on a house. She testified that, although she later saw Potts in municipal court, she did not have a conversation with him. (Tr. 484–87)[5]

Audrey Blackwell is the mother of Dina Blackwell, whom she identified as Tullies's wife. Audrey Blackwell did not witness the events, but corroborated that Tullies had borrowed her car, a Nissan Altima, on October 4, 2017. Following the arrests, she recovered the car from the police at Weequahic Avenue. (Tr. 479–82)

## II.    Procedural Background

Defendants Tullies and Williams were originally charged by complaint filed on December 19, 2017. (DE 1) On January 19, 2018, Tullies and Williams were jointly indicted. (DE 13) All counts were charged as occurring "[o]n or about October 4, 2017."

The first three counts of the indictment, charged jointly against both defendants, are:

Count 1:    Conspiracy to distribute heroin (21 U.S.C. § 846)

---

[4]    Potts was not ultimately charged in this federal case, but separately in state court. He pled guilty and was sentenced to a term of community service. (Tr. 468)

[5]    One purpose of this testimony about Potts, it became clear, was to blunt the possible impact of recorded jailhouse telephone calls between Tullies and Dina Blackwell. In those calls, Tullies repeatedly urged Dina Blackwell to contact Potts online, which she did. He told her to attend Potts's court appearances and speak to him about the case, to "write up what John Potts should say," and to obtain a photo of Potts's identification. (Tr. 492–93) She acknowledged setting up post-arrest conference calls between Tullies and Williams. (Tr. 491)

Having first testified that "I never spoke to Mr. Potts" (Tr. 493), Dina Blackwell then admitted that, at "the first [court appearance] when they all got arrested," she "pulled [Potts] aside," that she "spoke to him outside," and that he gave his contact information to her daughter, Amaya Smith. (Tr. 493–94)

| Count 2: | Distribution, possession with intent to distribute heroin (21 U.S.C. § 841(a)(1) & (b)(1)(c)) |
| Count 3: | Distribution, possession with intent to distribute cocaine base (21 U.S.C. § 841(a)(1) & (b)(1)(c)) |

The remaining counts, charged against Tullies or Williams individually, are:

| Count 4: | Possession of firearm by a felon (18 U.S.C. § 922(g)(1)) (Tullies) |
| Count 5: | Possession of firearm by a felon (18 U.S.C. § 922(g)(1)) (Williams) |
| Count 6: | Possession, use and carrying of firearm in furtherance of drug trafficking crime (18 U.S.C. § 924(c)(1)(A)(i)) (Tullies) |
| Count 7: | Possession, use and carrying of firearm in furtherance of drug trafficking crime (18 U.S.C. § 924(c)(1)(A)(i)) (Williams) |

On June 4, 2018, a jury was selected but not empaneled. (DE 43) On June 5, 2018, the Court conducted a suppression hearing and heard motions *in limine*. (Tr. 1 *et seq.*) After the motions were decided, the jury was empaneled.

Opening statements and the introduction of evidence commenced on June 6, 2018. (Tr. 99 *et seq.*) On June 7, 2018, the government rested, and the defense moved for a judgment of acquittal, which was denied. (Tr. 432–33; *see also* Tr. 563) The defense then put on a case that included the testimony of five witnesses. The defendants themselves did not testify. (Tr. 434–96) The court conducted a final charge conference. (Tr. 496–510) Both sides delivered their summations to the jury. (Tr. 510–552)

The following morning, June 8, 2018, defense counsel made a motion for a mistrial based on statements in the government's summation which, they said, implied wrongdoing on dates other than October 4, 2017. (Tr. 559) The Court denied the mistrial motion, but offered to incorporate a curative instruction into the jury charge. (Tr. 563–65) The Court then instructed the jury as to the law governing their deliberations. (Tr. 565–617) The instructions

included an admonition that any references to events apart from those of October 4, 2017, were not to be considered. (Tr. 568–69; *see also* Tr. 570.) As to Counts 4 and 5, the felon-in-possession charges, the presentation of evidence had been bifurcated. The jury therefore was not instructed to return a verdict as to those two counts, but only to answer two interrogatories that asked whether each defendant had knowingly possessed each firearm in interstate commerce.

On June 8, 2018, the jury returned a verdict of guilty on counts 1, 2, 3, 6, and 7. They answered the interrogatories regarding Counts 4 and 5 in the affirmative. (DE 56 (Jury Verdict); Tr. 628–32) Following the reading of that verdict, the jury heard additional evidence on the bifurcated Counts 4 and 5. The government introduced stipulations that each defendant had a prior conviction for an unspecified felony. (DE 57, 58; Tr. 634-35) The Court delivered supplemental legal instructions as to Counts 4 and 5. (Tr. 636–39) The jury again deliberated, and then returned verdicts of guilty on Counts 4 and 5. (DE 62 (Supplemental Jury Verdict); Tr. 640–42)[6]

On June 15, 2018, Tullies timely filed a motion for judgment of acquittal, under Fed. R. Crim. P. 29(c), or in the alternative for a new trial, under Fed. R. Crim. P. 33. (DE 69) On July 3, 2018, Williams filed a one-sentence letter

---

[6]    Presentation of evidence on Counts 4 and 5 was bifurcated so that the jury's deliberations on the other offenses would not be tainted by the knowledge of a prior conviction. It was for that reason that the jurors were initially instructed only as to the first two elements (knowing possession and interstate commerce), and asked only to answer interrogatories about those two elements. After the jurors returned their initial verdict and answered yes to the interrogatories, the government was permitted to introduce stipulations as to the third element, *i.e.,* that each defendant had a prior conviction of a felony offense. The felony, however, was not specified. *See Old Chief v. United States*, 519 U.S. 172 (1997) (where defendant on trial for § 922(g) charge will stipulate to the existence of a prior felony, Fed. R. Evid. 403 balancing dictates that the nature of the felony may be withheld from the jury). The jurors were then given a more complete instruction as to all three elements of the felon-in-possession offense, and sent back to consider their verdict as to Counts 4 and 5. They found the defendants guilty.

joining in Tullies's motion. (DE 72)[7] The government filed an opposing brief. (DE 73) Tullies filed a reply (DE 74), in which Williams joined (DE 75).

## III.    Standards Under Rules 29 and 33

Under Rule 29, a defendant who asserts that there was insufficient evidence to sustain a conviction shoulders "a very heavy burden." *United States v. Anderson,* 108 F.3d 478, 481 (3d Cir. 1997) (quoting *United States v. Coyle,* 63 F.3d 1239, 1243 (3d Cir. 1995)). In reviewing a motion for acquittal, the court "must be ever vigilant ... not to usurp the role of the jury by weighing credibility and assigning weight to the evidence, or by substituting its judgment for that of the jury." *United States v. Flores,* 454 F.3d 149, 154 (3d Cir. 2006) (quoting *United States v. Brodie,* 403 F.3d 123, 133 (3d Cir. 2005)). The evidence is to be viewed in the light most favorable to the prosecution. *United States v. Hart,* 273 F.3d 363, 371 (3d Cir. 2001). The government receives "the benefit of inferences that may be drawn from the evidence and the evidence may be considered probative even if it is circumstantial." *United States v. Pecora,* 738 F.3d 614, 618 (3d Cir. 1986). Credibility conflicts, too, are to be resolved in the government's favor. *United States v. Scanzello,* 822 F.2d 18, 21 (3d Cir. 1987). Having applied those principles of interpretation, the court must uphold the conviction if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319 (1979) (emphasis in original). *Accord United States v. Fattah,* 902 F.3d 197, 268 (3d Cir. 2018) (reviewing court, applying same standard as district court, must affirm "unless no reasonable juror could accept the evidence as sufficient to support the defendant's guilt beyond a

---

[7]    The deadlines for Rule 29 and 33 motions are coordinated. "A defendant may move for a judgment of acquittal, or renew such a motion, within 14 days after a guilty verdict or after the court discharges the jury, whichever is later." Fed. R. Crim. P. 29(c). "Any motion for a new trial grounded on any reason other than newly discovered evidence must be filed within 14 days after the verdict or finding of guilty." Fed. R. Civ. P. 33(b)(2). Tullies's motion was timely filed within the 14-day period. Because Williams's letter, filed beyond the 14-day period, did no more than join in with Tullies's already-filed motion, I have considered Tullies's arguments insofar as they apply to Williams as well.

reasonable doubt"); *United States v. Caraballo-Rodriguez*, 726 F.3d 418, 430-31 (3d Cir. 2013) (en banc) (reaffirming *Jackson* standard and reversing a line of drug conspiracy cases to the extent they undermined it); *United States v. Coleman*, 811 F.2d 804, 807 (3d Cir. 1987).

The standard under Rule 33 is more general; a court "may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33. When a defendant seeks a new trial claiming that the verdict was against the weight of the evidence, the court's review is less restricted than it is under Rule 29. "However, even if a district court believes that the jury verdict is contrary to the weight of the evidence, it can order a new trial 'only if it believes that there is a serious danger that a miscarriage of justice has occurred—that is, that an innocent person has been convicted.'" *United States v. Silveus*, 542 F.3d 993, 1004-05 (3d Cir. 2008) (quoting *United States v. Johnson*, 302 F.3d 139, 150 (3d Cir. 2002)). "Such motions are not favored and should be 'granted sparingly and only in exceptional cases.'" *Id.* at 1005 (quoting *Gov't of Virgin Islands v. Derricks*), 810 F.2d 50, 55 (3d Cir. 1987) (citations omitted)). A Rule 33 motion may also be based on an alleged error or combination of errors at trial. Borrowing the appellate concept of harmless error, district courts have held that a new trial will be ordered when it is "reasonably possible that such error, or combination of errors, substantially influenced the jury's decision." *United States v. Crim*, 561 F. Supp. 2d 530, 533 (E.D. Pa. 2008) (citing *U.S. v. Copple*, 24 F.3d 535, 547 n. 17 (3d Cir. 1994)), *aff'd*, 451 F. App'x 196 (3d Cir. 2011); *accord United States v. Bryant*, Crim. No. 07-267, 2009 WL 1559796 at *6 (D.N.J. May 28, 2009). In doing so, however, the court must consider the alleged errors in the context of the strength of the evidence of guilt, the scope of the objectionable conduct in relation to the entire proceeding, and the ameliorative effect of any curative instruction. *See United States v. Gambone*, 314 F.3d 163, 179 (3d Cir. 2003) (citing *United States v. Zehrbach*, 47 F.3d 1252, 1265 (3d Cir. 1995) (en banc); *United States v. Helbling*, 209 F.3d 226, 241 (3d Cir. 2000)).

The defendants argue that the evidence was insufficient to support the jury's verdict of guilty, requiring that a judgment of acquittal be entered under Rule 29. (*See* Section IV, *infra.*) The remaining grounds, primarily involving alleged prosecutorial misconduct in summation, are properly considered as arguments for a new trial under Rule 33. (*See* Section V, *infra.*)

## IV. Rule 29 Motion for Judgment of Acquittal

### A. Count 1 (Conspiracy to distribute heroin)

The jury was instructed, without objection, that the charged conspiracy under 21 U.S.C. § 846 has three essential elements: (1) that two or more persons agreed to distribute heroin; (2) that each defendant was a member of that agreement; and (3) that each defendant joined the agreement knowing of its illegal objective to distribute heroin and intending to achieve that objective. (Tr. 575–76) Such a knowing and intentional agreement, the jury heard, need not have been formal or even spoken; it is sufficient if two persons arrived at a mutual understanding or meeting of the minds. The proof of such an agreement may be circumstantial, based on the surrounding facts. (Tr. 577–79) Mere presence at the scene of an offense, however, is not enough; knowledge and intent are required. (Tr. 579–80)

The evidence as to the conspiracy was sufficient, and indeed quite strong. Most pertinently, Detective Ellis testified that, from an undercover observation point, he observed the defendants acting together to complete two hand-to-hand drug sales. The drugs were stashed beneath the rear bumper of the Chevy Lumina; to accomplish the two sales, small amounts were fetched once by Williams, and once by Tullies.

That testimony was corroborated. One of the two customers, Potts, was arrested a few blocks away in possession of heroin with a "Black Jack" stamp that matched the stamp on the heroin recovered from the stash in the Lumina. The defendants, when arrested, possessed substantial amounts of cash. Agent Havens gave expert testimony that the observations of the officer on surveillance were consistent with a street-level drug dealing operation.

11

From this evidence, the jury was entitled to infer that Tullies and Williams were working cooperatively to sell narcotics. To be sure, the defendants offered evidence of their own. Under the Rule 29 standard, however, I must presume that the jury, as they were entitled to do, found the government's evidence credible and rejected that of the defendants. As to Count 1, then, the Rule 29 motion for a judgment of acquittal is denied.

### B. Count 2 and Count 3 (Possession with intent to distribute heroin and cocaine base)

The jury was instructed, without objection, that the offenses of distribution and possession with intent to distribute narcotics require possession of a controlled substance; knowledge and intent; intent to distribute (or actual distribution) to another; and proof that the controlled substance is in fact heroin or cocaine base. (Tr. 583–84) Possession is defined broadly to include not just physical custody, but the ability to take possession and control. (Tr. 584)

As in the case of Count 1, the jury heard and was entitled to credit police testimony regarding the stash of heroin and cocaine base under the bumper of the Chevy Lumina. Each defendant retrieved drugs from the stash, demonstrating that he knowingly had possession, as possession is broadly defined. Intent to distribute was established *a fortiori* by Det. Ellis's observation of actual distribution. In addition, Agent Havens gave expert opinion testimony that the drugs seized were packaged for distribution. Finally, it was stipulated that the drugs were chemically analyzed as heroin and cocaine base.

As to Counts 2 and 3, then, the Rule 29 motion for a judgment of acquittal is denied.

### C. Counts 4 and Count 5 (Felon in possession of firearms)

Count 4 (Tullies) and Count 5 (Williams) charge the offense of being a felon in possession of a firearm (actually, three loaded firearms) in violation of 18 U.S.C § 922(g)(1). The jury was instructed, without objection, that the essential elements are that a defendant knowingly possessed at least one of the

12

firearms; that the firearm had traveled in interstate commerce; and that the particular defendant had previously been convicted of a felony offense. (Tr. 587–90, 636–39)

Expert opinion testimony of Agent Casanova established that the seized guns were operable firearms within the meaning of the statute, and that they had been manufactured out-of-state. (Tr. 342–58) The prior felonies were established by stipulation. (DE 57, 58; Tr. 634-35)

The element of possession was the only one seriously contested. The jury was instructed without objection that physically carrying the firearm was not necessary, but that the power and intention to exercise control over a firearm sufficed to establish possession. Possession, the jury heard, may be joint or individual. (Tr. 588–89)

The evidence established that the guns were stored, with the drugs, beneath the bumper of the Chevy Lumina. Likewise, it established that both defendants had free access to the stash under the bumper. Havens's expert testimony established the nexus between drugs and guns, permitting an inference that the loaded guns were stored in proximity to the drugs as tools of the narcotics trafficking trade. The jury could make the commonsense inference, for example, that the guns would permit the owners of the drugs to resist unauthorized access to the stash.

That evidence was sufficient. As to Counts 4 and 5, the Rule 29 motion for a judgment of acquittal is denied.

### D. Counts 6 and Count 7 (Use of firearm in drug trafficking crime)

Count 6 (Tullies) and Count 7 (Williams) charge possession of a firearm (again, actually three loaded firearms) in furtherance of a drug trafficking crime.[8] 18 U.S.C. § 924(c). The jury was instructed without objection that the defendant must have committed one of the drug trafficking offenses charged in Counts 1, 2, and 3, and knowingly possessed a firearm in furtherance of one of

---

[8]     Because I find the evidence sufficient as to this possession-in-furtherance theory, I do not discuss the alternative theory of "using and carrying" a firearm. *See* 18 U.S.C. § 924(c).

13

those crimes. "In furtherance" means to promote or advance the goal of drug trafficking as charged. Mere presence of a firearm at the scene is not sufficient to satisfy the "in furtherance" element, which must be assessed in light of such factors as the nature of the criminal activity, the accessibility of the firearm, the type of firearm, whether it is stolen, whether it is possessed legally, whether it is loaded, the time and circumstances, and proximity of the firearm to drugs or drug profits. (Tr. 591–93)

The jury's verdict of guilty was sufficiently supported by the evidence. For the reasons stated above, the defendants' joint or constructive possession of the guns was established because they clearly had access to the car-bumper stash. That the guns were possessed in furtherance of the drug trafficking was likewise clear. As Agent Havens testified, guns are a tool of the trafficking trade, used to protect territory, guard against robbery, and enforce payment if necessary. Placing them in the stash, as he testified, is a typical way for traffickers to maintain deniability while keeping the guns accessible to protect the drugs. The guns were in immediate proximity to the drugs. They were there at the very time the trafficking was occurring. All three were loaded and ready for immediate use. There was no evidence either way, however, as to their ownership.

That was sufficient evidence that the guns were possessed and intended for use in furtherance of narcotics trafficking. As to Counts 6 and 7, the Rule 29 motion for a judgment of acquittal is denied.

## V. Rule 33 Motion for New Trial

### A. *Doyle* error in cross-examination of Potts

As noted above, Potts testified that he had bought drugs from two unidentified "younger kids," not from the defendants. (Tr. 452–53)

On cross-examination, Potts was impeached on a number of grounds, including his admitted status as a heroin addict and a recent heroin charge. (Tr. 475, 477) The government attorney cast doubt on his assertions that he had no regular source of supply, but approached two strangers. (Tr. 476) Also

14

pertinent was the fact that no other witness, including the police and Tullies's witnesses, saw those two unidentified males on the street.

Most pertinently, the government's cross-examination suggested bias and a motive to fabricate—namely, fear of the defendants. Potts admitted that he had learned that Tullies and Williams were accused of being armed drug dealers. (Tr. 471) As a heroin addict, Potts agreed, he "kn[e]w drug dealers can be dangerous." (Tr. 476)

Potts testified at first that he had "never" spoken to any of Mr. Tullies's family members or friends. He then admitted that this was "not truthful." (Tr. 470 ("Okay. Yeah.")) Potts backtracked and said he had "met" Tullies's wife or girlfriend, who showed up at the courthouse for one of Potts's court appearances, but did not speak to her "about the case."

The government established that Dina Blackwell had attended Potts's court appearance, uninvited. (Tr. 472) Backtracking again, Potts said he had some conversation with her, but could not remember anything about the contents. (Tr. 457, 470, 472–73) In this version, that was the only court appearance at which he met Dina Blackwell, and the two of them spoke alone.

At the time of the first court appearance, Potts did not tell anyone, at least in court, that "it wasn't those guys" (i.e., the defendants) who sold him the heroin. (Tr. 471–72) Potts admitted that he never exculpated the defendants until sometime after he had spoken to Dina Blackwell. (Tr. 474)

On redirect examination by defense counsel, Potts then remembered meeting Dina Blackwell in the company of his counsel and a defense investigator at his second court appearance. At that time, however, he said he spoke directly only to the investigator. (Tr. 477–78)

Potts testified that he did not offer an exculpatory explanation until after he pled guilty in municipal court and was sentenced to community service. The government elicited that even then, however, Potts declined to speak with the government and only spoke to others. (Tr. 469–70)

During Potts's cross-examination, the defense made a speaking objection, in the jury's hearing, that Potts's initial failure to exculpate the

15

defendants should not be considered, because he had the right under the Fifth Amendment to remain silent. (Tr. 467) When the government questioned Potts about this subject, the Court interjected a cautionary instruction:

Q.  You had the opportunity to speak to police if you had wanted to?

A.  I guess.

Q.  Okay.  And --

THE COURT:  But, of course, he was not required to, and he had an equal right to remain silent, if he wished to.

(Tr. 468)

During cross-examination about the Potts's belated exculpation of the defendants, the defense made an objection based on "relevance" (Tr. 469). I again instructed the jury to avoid any unfair inference:

THE COURT:  Once again, I'm not going to permit any inference to be drawn from the fact that a person exercised his right to remain silent.

Ladies and gentlemen, that's an arrestee's constitutional right. We're not -- many people invoke that right, and you cannot assume, just because they invoke that right, that they were withholding some sort of information.

It's often actually prudent to remain silent if and when one is arrested. So I'm not going to permit any inference to be drawn from that.

But if you want to talk about the -- what he did say and when he said it, that's perfectly okay, and you can go ahead and do that.

(Tr. 469)

Defendants briefly raise a Fifth Amendment objection as grounds for a new trial. Under *Doyle v. Ohio,* 426 U.S. 610 (1976), it has long been held that a *defendant's* post-arrest, post-*Miranda*-warning silence cannot be used to suggest that defendant's guilt at trial. This cross-examination, however, did not violate any Fifth Amendment right possessed by Tullies or Williams. *See Alderman v. United States*, 394 U.S. 165, 205, 89 S. Ct. 961, 983 (1969)

16

(recognizing that "[o]nly the person whose [Fifth Amendment] right has been violated can claim the protection of that privilege") (Fortas, J., concurring in part and dissenting in part); *In re Grand Jury*, 597 F.2d 851, 860 (3d Cir. 1979) ("the Fifth Amendment is a personal right which may be exercised only by the person against whom governmental compulsion is directed"); *see also Bowman v. United States*, 350 F.2d 913, 915-16 (9th Cir. 1965), *cert. denied*, 383 U.S. 950, 16 L. Ed. 2d 212, 86 S. Ct. 1209 (1966) (denying standing to raise objection to improper denial of another's right to "take the Fifth.").

It was fair to point out on cross-examination that Potts's exculpatory testimony occurred after he learned that the defendants were accused of being armed drug dealers, and after he had been approached, inferably on Tullies's behalf, by Dina Blackwell. Of course the defendants, on redirect, could have explored the idea that fear of self-incrimination, not fear of the defendants, motivated Potts's (initial) silence. They did not do so, possibly because the Court's instruction had already made their point.[9]

Neither in itself nor in combination with other objections does the defendants' suggested extension of *Doyle* require a new trial.

### B. References in summation/motion for mistrial

Defendants also seek a new trial based on the Court's denial of their motion for a mistrial based on the prosecutor's comments in summation. That motion for mistrial had two interrelated parts. First, the defense objected to the prosecutor's reference to Stephanie Davis's testimony about Tullies's usual presence on Weequahic Avenue, and a rhetorical question as to why he was "always there." Second, the defense cited the prosecutor's discussion of Potts's testimony that as an addict, he would prefer to have a regular source of supply. These references, says the defense, were intended to unfairly suggest that Tullies dealt drugs on the block at some time other than October 4, 2017.

---

[9]     In his reply brief, counsel for Tullies states that Potts's public defender informed the prosecution that he would not cooperate or incriminate the defendants. I do not agree with Tullies that the prosecution misled the jury on this issue, and Potts himself did not say so. At any rate, counsel was free to examine the witness on this basis if he considered it important.

### 1. Summation error: The record

#### a. Davis's testimony

The objected-to passage in the prosecutor's summation was based on this testimony of Stephanie Davis:

Q. Going back to October 4th, you were looking for -- you and Ms. Travers were looking for her father that day, right?

A. Yes.

Q. And you were waiting for him on Weequahic Avenue?

A. Yes.

Q. And you thought he would be there?

A. Yes.

Q. And you knew to meet him there?

A. Say it again.

Q. Let me retract.

Even if he wasn't on Weequahic Avenue, you knew that he would be there?

A. He would show up possibly.

Q. And Weequahic Avenue is exactly where you eventually found him?

A. Yes.

Q. Because that's where he usually hangs out?

A. Yes.

(Tr. 441–42)

#### b. The prosecutor's summation as to Davis

Here is the passage in the prosecutor's summation that discussed the relevant testimony of Davis:

Stephanie Davis, who is Defendant Tullies' daughter's best friend, she testified that she and her friends went to Weequahic Avenue to look for Tullies. Why did they go to Weequahic Avenue? She said because he's always there. Ask yourself, ladies and gentlemen, why is he always there? We know from the Currency Seizure Report that he doesn't live there. He doesn't even live in Newark. Same

18

thing for Mr. Williams. He doesn't live there. Why is he always there?

(Tr. 517)

### c. *The prosecutor's summation as to Potts*

I do not here summarize the testimony of Potts, already discussed in Sections V.A & I.A, above.

Discussing Potts's credibility in summation, the prosecutor stated as follows:

> Potts admitted that, as an addict, he usually has a source of supply, a usual source of supply, that drug dealers are dangerous. He said he usually goes to the same seller.
>
> His story about buying from two other men on the street is simply not credible. Again, what an ironic coincidence. Two black males, about six feet, on the same street, at the same time, but just happened to go completely unnoticed by anyone else.

(Tr. 507)

### d. *The motion for mistrial*

The morning after the summations, after reviewing the transcript, counsel for Tullies objected as follows:

> MR. MURPHY . . . As you recall, your Honor, the indictment in this matter specifically dealt with a conspiracy charge on or about October 4th, 2017. And the other counts of the indictment specifically reference October 4th, 2017.
>
> Mr. Navarro, in his summation, I'm -- I happen to have a copy of the transcript, so I am going to quote chapter and verse here.
>
> At page 517 and lines 10 to 17, Mr. Navarro -- Stephanie Davis, defendant's daughter's best friend, testified that she and her friends went to Weequahic Avenue to look for Tullies. Why did they go to Weequahic Avenue? Why did they go to Weequahic Avenue? She said because he's always there. Ask yourself, ladies and gentlemen, why is he always there?
>
> So that's number one.

Number two, the inference being because it is a drug dealing area and he deals drug.

The next one is page 520, starting at line -- or, actually, approximately line 2 and 3, this is when Mr. Navarro is discussing Mr. Potts and basically he says – I'm sorry -- page 520 at line 1 to 3, Potts admitted that he's an addict. He usually has a source of supply -- a usual source of supply, that drug dealers are dangerous. He said he usually goes to the same seller, same inference, that this is not the first time Mr. Potts bought off my client.

Again, they're stuck with the indictment that basically says one day, or about one day for the conspiracy, and the other charges in the indictment are specific to October 4th.

The inference clearly to the jury is that my client is a drug dealer out there on different dates, selling, and specifically selling on other dates to Mr. Potts.

Now, I think that is an improper inference, and I'm asking for a mistrial. If not that, at least a curative instruction to make this jury understand that there's been no -- obviously, no evidence of any -- any of my client's previous drug dealing.

The problem is that one of the battles we've had continually in this case is the government's attempt to introduce my client's activities in that particular area on other occasions, and I think it just spilled over into his summation.

THE COURT: Well, that's one way to look at it. The other way to look at it is it's a little hard to steer around those prior convictions. I think we've been pretty successful on that.[10]

MR. GIANNETTA: Judge, I will join in on the application.

(Tr. 559–61)

### e. *The Court's ruling*

THE COURT: All right. Listen, I'm going to deny a mistrial. But I will -- I mean, I won't do it over defense objection, but I will, if

---

[10] The reference was to the pretrial motion *in limine,* in which the government sought to introduce evidence of the defendants' prior convictions for dealing drugs within one block of the Weequahic Avenue location. *See* pp. 4–5 & n.3, *supra*; Tr. 5–86.

requested by the defense, deliver an instruction reminding the jury that they are not to draw any inference from any evidence as to, frankly, any other criminal activity that may have occurred at any time other than 10/4/2017 at that corner, that we -- that they're not on trial for anything else, and they're not to consider it.

I'd be happy to give such an instruction or if you want to craft something that you would like a little better, I'll listen to you.

(Tr. 563) I ensured that the defendants preserved their request for a mistrial while requesting that such a curative instruction be given. (Tr. 564–65)[11]

The defense did not, however, take up the court's invitation to propose any particular language for an instruction. Nor did the defense object to the instruction that the court did give, or request that it be supplemented.

### f. The curative instruction

The defendants' objection to the prosecution summation, as I say, did not occur until the following morning. The curative instruction I gave came promptly after the objection, at an appropriate point in my jury instructions, which immediately followed my ruling on the mistrial motion. In short, the curative instruction was as prompt as was practical. Under the circumstances,

---

[11]   THE COURT: No, no, no, no, no. Listen, I accept that a sufficiently imaginative juror could draw such an inference from what you said, that maybe -- not that there's been evidence, but, oh, the lawyer knows about something. And I am willing to clear that up, if you suggest to me -- I don't think we're in mistrial territory.

As I say, it would take an imaginative juror and somebody who was not following the instruction to apply the evidence in order to draw that inference, but I am willing to clear it up and try to prevent, out of caution --

MR. MURPHY: That's fine, your Honor. Obviously, we would like a curative instruction.

THE COURT: I understand you're preserving your motion for a mistrial, but assuming you lose that, you would like a curative instruction. Do I understand you correctly?

MR. GIANNETTA: Correct.

MR. MURPHY: Yes, your Honor.

(Tr. 564)

I judged that such a curative instruction would be most meaningful in the context of my instructions as to what the jury could and could not permissibly consider. The defense, although invited to do so, did not suggest any language, so the instruction was necessarily improvised by me.

The instruction I gave was directed not only to the matters raised in the mistrial motion, but to the defense's more general concern, voiced throughout the proceedings, that the jury be barred from considering defendants' guilt of any actions other than those on the afternoon of October 4, 2017:

> Here -- I want to inject a particular note here. From time to time in the course of summations or in the course of the evidence, there has been -- there have been references which you could take to apply to something other than the events of October 4, 2017.
>
> For example, references to, you know, territory or references to -- by Mr. Potts to buying drugs on some occasion other than this one because he did so regularly.
>
> There may have been evidence like that. The expert may have referred to things like that. There may have been references to it in summations.
>
> Remember, what this case is about and what it is only about, it is only about the events of October 4, 2017, and you are not to speculate about anything else. There's been no evidence about any other criminal activity of any kind. So you are not to give that any consideration whatever.

(Tr. 568–69)

My instruction was intended to ensure that the jury did not infer that defendants were on trial for habitually selling drugs at the Weequahic Avenue "territory," or for anything other than what was charged in the indictment.

In addition, I delivered the usual instructions to the jury that they were to base their verdict "only on the evidence" and not "suspicions" (Tr. 567); that "statements and arguments of lawyers" are not evidence (Tr. 568); and in particular that "what the lawyers said, in summations or otherwise, is not evidence" (Tr. 570). I again repeated that "[i]t is your own recollection and interpretation of the evidence that controls your decision in this case, and it is

22

only the evidence about what occurred on 10/4/2017 that is relevant and should be considered by you." (Tr. 570)

## 2. Summation error: standard of review

The Rule 33 inquiry is a somewhat flexible one; still, formal standards of review on appeal are useful in guiding the court's Rule 33 analysis. I will therefore determine preliminarily whether this claim would be reviewable under the ordinary "prejudice" standard or the more demanding "plain error" standard for statements that were not objected to at the time.[12]

It is true, as the government states, that defense counsel did not interrupt the prosecution's summation with an objection. Because I discourage such interruptions, I would not penalize the defense for that.[13] Neither, however, did the defense object at the close of the prosecution's summation, address the matter in its own summation, or object after the prosecution's rebuttal summation. It was not until the following morning, when the Court was about to charge the jury, that the defense moved for a mistrial. (Tr. 559) Nevertheless, I think that was enough to preserve for review the question of whether the court erred in denying a mistrial. It does raise an issue as to

---

[12]   Ordinarily, the court will reverse if defendant can show that she has suffered prejudice. *Zehrbach,* 47 F.3d at 1267. Here, however, because [defendant] did not object to the prosecutor's comments at closing or rebuttal, the Court will review for plain error. *United States v. Harris,* 471 F.3d 507, 512 (3d Cir. 2006); *United States v. Wright,* 845 F. Supp. 1041, 1065 (D.N.J. 1994). When reviewing claims of prosecutorial misconduct under the plain error standard, the question is whether the prosecutor's comments caused "substantial prejudice" to the defendant "by so infecting the trial with unfairness as to make the resulting conviction a denial of due process." *Brown,* 765 F.3d at 296 (internal quotation marks and citations omitted).

*United States v. Onque,* 169 F. Supp. 3d 555, 572 (D.N.J. 2015), *aff'd,* 665 F. App'x 189 (3d Cir. 2016).

[13]   My policy is to discourage counsel from interrupting each other's summations with objections, a practice which lends itself to abuse. Mr. Murphy, for his part, specifically stated that "I don't object during closing arguments, and my objection is based – is brought forth in my motion for a mistrial." (Tr. 564–65) Although I do not seem to have announced that policy explicitly in this case, experienced counsel may well have been aware of my preference.

whether the prosecutor's summation was truly as egregious as is now claimed, *see* pp. 28–29, *infra*, but that is a separate matter.

In assessing this claim of trial error, the Court must consider the ameliorative effect of any curative instructions. *See Gambone,* 314 F.3d at 179. As an alternative to mistrial, I gave a curative instruction, as requested. As to the adequacy of that instruction, there was no issue preserved. Before delivering an instruction, I solicited suggestions, but received none. Nor was any objection made after the delivery of the instruction. *See* Fed. R. Crim. P. 30(d).[14]

On that score, *Greer v. Miller,* which involved testimony elicited in violation of the defendant's Fifth Amendment rights under *Doyle, see supra*, is instructive:

> [Defendant] Miller argues that the curative instructions should have been more specific. But Miller's trial counsel bore primary responsibility for ensuring that the error was cured in the manner most advantageous to his client. Once it became apparent that the judge was not going to grant a mistrial, it was the duty of counsel to determine what strategy was in his client's best interest.

483 U.S. 756, 767, 107 S. Ct. 3102, 3109 (1987). So too here.

### 3. Summation error: Discussion

The main claim here is that a prosecutor's rhetorical question in summation invited the jury to convict based on drug dealing other than that charged in the Indictment:

> Why did [Stephanie Davis and Leanna Travers] go to Weequahic Avenue? [Davis] said because he's always there. Ask yourself, ladies and gentlemen, why is he always there?

---

[14]     (d) Objections to Instructions. A party who objects to any portion of the instructions or to a failure to give a requested instruction must inform the court of the specific objection and the grounds for the objection before the jury retires to deliberate. An opportunity must be given to object out of the jury's hearing and, on request, out of the jury's presence. Failure to object in accordance with this rule precludes appellate review, except as permitted under Rule 52(b).

(Tr. 517) That specific reference was to Tullies, but the prosecutor also questioned the lack of any legitimate explanation for the presence of the codefendant, Williams. (Full passages quoted above at sections V.B.1.a & b.) The error, says the defense, was asking why Tullies was *always* on that block, as opposed to asking why he was on the block on October 4, 2017. The prosecutor's question, they say, implied drug dealing on other occasions, and therefore invited the jury to convict based on uncharged illegal activity.

In addition, the defendants fault the prosecutor for comments in summation casting doubt on Potts's story that he bought heroin from two random strangers. As an addict, the prosecutor argued, Potts knew drug dealers were dangerous and would have sought to buy from a regular source. (Tr. 520; *see* Tr. 476) This too, say defendants, implied drug dealing on other occasions.

Former Chief Judge Simandle has helpfully reviewed the standards governing a claim of summation error in the context of a Rule 33 motion for a new trial:

> A prosecutor's comments during summation or rebuttal are improper if the statements mischaracterize certain evidence or are based upon evidence not in the record. *United States v. Brown,* 765 F.3d 278, 296 (3d Cir. 2014); Wright et al., Federal Rules of Criminal Procedure § 588 (4th ed. 2011) (noting that it is misconduct for prosecutor "to make an assertion to the jury of fact … unless there is evidence of that fact" and prosecutor also should not "import his own testimony into the trial" or "misstate the law in closing argument."). However, not all improper comments require reversal. The Supreme Court has emphasized that "a criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context." *United States v. Young,* 470 U.S. 1, 11, 105 S. Ct. 1038, 84 L.Ed.2d 1 (1985). In other words, the court must analyze comments on a "case by case basis, in the context of the entire trial." *United States v. Zehrbach,* 47 F.3d 1252, 1267 (3d Cir.1995) (en banc) (citing *Young,* 470 U.S. at 11, 105 S. Ct. 1038). Moreover, in summation, a prosecutor is "entitled to considerable latitude … to argue the evidence and any

reasonable inferences that can be drawn from that evidence."
*United States v. Werme*, 939 F.2d 108, 117 (3d Cir. 1991).

*Onque*, 169 F. Supp. 3d at 571–72.

In deciding whether alleged summation error rendered the proceedings unfair, the Court is to consider a number of factors, especially (a) the nature of the comments objected to; (b) the effect of any curative instructions; and (c) the strength of the evidence of guilt.[15]

### a. Nature of comments/objection

The first factor is the severity of the alleged summation error to which the defendants objected.

The government asserts that the prosecutor's "always there" statement in summation was a fair comment on Davis's testimony. Consider the defense proffered at trial, which was essentially one of misidentification. Defendants called Potts, the customer, to testify that two other unidentified males, and not themselves, had done the drug deals witnessed by the undercover officer. It would have been fair game for the prosecution to probe that contention by pointing out that there was no evidence that defendants had any legitimate business on Weequahic Avenue that day.

So even assuming that the comment was improper in one aspect, it surely had a legitimate point as well. The defense had offered no explanation of why the defendants—who did not live in the area or have any other business there—were on Weequahic Avenue, if not for the purpose of dealing drugs. That point, as far as it goes, does not depend on an inference of uncharged criminal activity. It is true, of course, that the prosecutor's comment or question was

---

15     *United States v. Welshans*, 892 F.3d 566, 578 (3d Cir. 2018) (considering "the severity of the conduct, the effect of the curative instructions, and the quantum of evidence against the defendant"); *United States v. Morena*, 547 F.3d 191, 194 (3d Cir. 2008) (considering "the prosecutor's improper actions," "the weight of properly admitted evidence," and "any curative instructions given by the trial court"); *Moore v. Morton*, 255 F.3d 95, 107 (3d Cir. 2001) (court reviewing claims of improper prosecutorial remarks during summation "must examine the prosecutor's offensive actions in context and in light of the entire trial, assessing the severity of the conduct, the effect of the curative instructions, and the quantum of the evidence against the defendant").

couched in terms of why Tullies was "always" on that block.[16] But so was Davis's testimony on cross-examination, and Davis was a defense witness. She testified, without objection, that defendant Tullies usually hung out on that block, but could supply no cogent explanation for his presence. Tullies's daughter, too, was seemingly at a loss to explain why she thought that if she drove to this block, she would find him there. (Tr. 449)[17]

The government's argument is essentially that unless an objection is sustained, the prosecution is free to comment on admitted testimony as-is. The argument can be pushed too far; the court will not permit counsel to take unfair advantage of a witness's incautious or unsophisticated phrasing. But neither will the court "lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through a lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations." *Donnelly v. DeChristoforo*, 416 U.S. 637, 646 (1974).

As for the summation arguments about Potts and his regular source of supply, there is a fundamental problem with the defendants' argument. That summation was an accurate summary of the evidence.[18] That evidence had

---

16    I must point out (the parties do not) that Davis never uttered the precise words "always there." On cross-examination, Davis's only explanation for Tullies's presence on Weequahic Avenue was her agreement that "that's where he usually hangs out." (Tr. 441–42) The defense does not make an issue of the distinction between "always there" and "usually hangs out" there, and apparently no one noticed it at the time. Even the following morning, when defense counsel made their mistrial motion after review of the transcript, they did not object to this inaccuracy. Accuracy is of course important, but I do not give the discrepancy great weight; a juror would understand that when, for example, I complain that my father is "always" nagging me to clean my room, I mean that he does so continually, not continuously. At any rate, the jury was instructed more than once that the lawyers' statements were not evidence, and that its own recollection must control. (*E.g.*, Tr. 568, 570)

17    As noted above, the government proffered Rule 404(b) evidence that Tullies had three prior convictions, and Williams had one, for dealing drugs within one block of the Weequahic location. *See* n.3, *supra*. Although the government did not ultimately offer that evidence, it might attempt to do so at any retrial. At this trial, however, those facts were not before the jury and cannot be considered part of the record.

18    Q. Now, you said -- let's talk about -- go back to October 4. You said you went to Weequahic. I think you said you bought from two random black males. You don't know their names?

27

been elicited on cross-examination of Potts and admitted without objection. Given the defense that was interposed—that two other African-American males, not the defendants, were dealing drugs on Weequahic Avenue—I would not have sustained such an objection. The evidence had become directly relevant to the now-contested issue of identity. It was not plain error to admit it, nor was it error for the prosecution to refer to it.

Circumstances suggest that no one contemporaneously gave the prosecutor's statements their most damaging interpretation, *i.e.,* an inference of uncharged criminal activity. No defense objection was made following the prosecutor's summation. The defense summed up, the prosecution delivered its rebuttal, and the court recessed overnight. Only the following morning, with the benefit of the transcript, did the defense move for a mistrial. Seemingly the

---

A. No idea.

Q. You don't know their street names?

A. No.

Q. How tall were they?

A. About six foot.

Q. How old?

A. Younger, between 18 and 20.

Q. So you just -- your testimony is you drove up to two random strangers on Weequahic Avenue, where you've bought before, and you bought from two random strangers?

A. Correct.

Q. So you bought from two random black males, but not these two random males?

A. Correct. . . . .

Q. As a heroin addict, you know it's important to have a source of supply?

A. I guess, yeah.

Q. And as a heroin addict, you know drug dealers can be dangerous, right?

A. Sure.

Q. And as a -- as a recovering addict, it's good to have a usual seller, isn't it?

A. Sure.

(Tr. 475–76)

allegedly prejudicial effect of the remarks was not immediately apparent, even to trained counsel, except upon analysis of the transcript.

In that regard, an instructive case is *Gov't of Virgin Islands v. Charleswell,* 24 F.3d 571 (3d Cir. 1994). There, the defendant had gone to trial on a diminished-capacity defense. The prosecutor delivered a rebuttal summation in which he stated that the defendant was "not crazy otherwise he would have pleaded insanity." The prosecutor added that if acquitted, the defendant would not get the help he needed. *Id.* at 396. Counsel did not object until after the regular jury charge. After discussion with counsel, the trial court delivered curative instructions. The Appellate Division of the Virgin Islands reversed, finding that the instructions did not cure the unfairness. The U.S. Court of Appeals for the Third Circuit, however, upheld the conviction.

The comments, then-Judge Alito wrote, "while inappropriate, do not appear to us highly prejudicial." *Id.* at 576. "In addition, these remarks were apparently 'not so shocking as to suggest to the defense that it seek curative instructions immediately. "[T]hese remarks were apparently 'not so shocking as to suggest to the defense that it seek curative instructions immediately. . . .'" *Id.* at 576 (quoting *United States v. Homer,* 545 F.2d 864, 868 (3d Cir. 1976)).

Davis's cross-examination testimony, as I say, was admitted without objection, as was that of Potts. By commenting on the evidence in the form in which it was admitted, the prosecutor did not evince any untoward motive. To my mind, the comments were less severe than those found "not highly prejudicial" in *Charleswell,* and, as in *Charleswell,* the defense did not object immediately, although it did eventually.

Still, the prosecution here could have steered clear of any suggestion of past drug dealing by arguing that there was no alternative explanation for the defendants' presence on that particular day, rather than in general. I will therefore assume *arguendo* that there was some impropriety in the summation. I therefore consider the other two factors.

### b. Curative instructions

The second factor is the effect of any curative instruction. I find that it weighs heavily against the grant of a new trial.

Even where a jury has heard unconstitutional evidence—not the case here—a court will normally presume that the jury obeyed instructions to disregard it:

> We normally presume that a jury will follow an instruction to disregard inadmissible evidence inadvertently presented to it, unless there is an "overwhelming probability" that the jury will be unable to follow the court's instructions, *Richardson v. Marsh*, 481 U.S. 200, 208, 107 S. Ct., 1702, ——, 95 L.Ed.2d 176 (1987), and a strong likelihood that the effect of the evidence would be "devastating" to the defendant, *Bruton v. United States*, 391 U.S. 123, 136, 88 S. Ct. 1620, 1628, 20 L.Ed.2d 476 (1968). We have no reason to believe that the jury in this case was incapable of obeying the curative instructions.

*Greer v. Miller*, 483 U.S. 756, 767, 107 S. Ct. 3102, 3109 (1987) (upholding conviction where trial court had instructed the jury to disregard *Doyle* error). Indeed, one of the few areas in which a jury will not be deemed capable of disregarding evidence is the one identified in the quotation: the admission of the incriminating confession of a codefendant who is not testifying and therefore cannot be cross-examined. *See id.* (citing *Richardson, supra; Bruton, supra*). Nothing like that level of inflammatory constitutional error is alleged here.

Defense counsel here, as in *Greer, supra,* did not suggest language for the instruction or object to the instruction the trial court delivered, and so will not be heard to argue that the wording was inadequate. *See* 483 U.S. at 767, 107 S. Ct. at 3109 ("Miller argues that the curative instructions should have been more specific. But Miller's trial counsel bore primary responsibility for ensuring that the error was cured in the manner most advantageous to his client. Once it became apparent that the judge was not going to grant a mistrial, it was the duty of counsel to determine what strategy was in his client's best interest.")

As in *Charleswell,* discussed at p. 29, *supra*, the error was not particularly severe, the defendants objected to the comments, and "the trial judge admonished the jury' to disregard these comments." 24 F.3d at 576 (quoting *United States v. Homer*, 545 F.2d 864, 868 (3d Cir. 1976)). Like that court, I find that the court's curative instructions sufficed to ensure that the conviction was not obtained in an unfair manner.

### c. Strength of the evidence

Finally, I consider the strength of the evidence, which is surveyed in more detail at section I, *supra*. (*See also* Sections V.A and V.B.1.) The issue here is not mere sufficiency. *See* Section IV, *supra*. I must consider more broadly whether the alleged error affected the verdict, taking into account whether it "shaped the development of the record evidence ... or the trial strategy pursued by either party." *United States v. Welshans*, 892 F.3d 566, 578 (3d Cir. 2018) (quoting *United States v. Liburd*, 607 F.3d 339, 345 (3d Cir. 2010)). The evidence of guilt was quite strong, and I cannot find that the prosecutor's statements in summation affected the verdict.

On October 4, 2017, an undercover Sheriff's officer, Det. Ellis, personally observed the two hand-to-hand narcotics transactions. For the first transaction, Williams retrieved the narcotics from the stash beneath the bumper of a Chevy Lumina parked in the driveway of 249 Weequahic Avenue; for the second transaction, Tullies retrieved the narcotics. Each time, a defendant took a plastic bag from underneath the bumper of the Chevy, removed some of the contents, replaced the bag, and walked back down the driveway to the street. Det. Ellis then saw the drugs and money change hands between Tullies and two customers. The first customer, who arrived in a green Honda Civic, was subsequently identified as John Potts; the second, who arrived on foot, was a woman who was never identified or apprehended.

Within five minutes, Det. Ellis radioed backup officers in the area. Two detectives immediately arrested Tullies and Williams. Tullies possessed $1275 in currency and Williams possessed $360 in currency.

Another detective pulled over Potts in the green Civic. He surrendered two glassine envelopes of heroin, bearing the brand stamp "Black Jack."

Two detectives searched the Chevy Lumina. Under the bumper was a bag containing some 198 glassine folds of heroin, rubber-banded in bundles of ten, and stamped with the brand name "Black Jack," matching those recovered from Potts. Also under the bumper were "jugs" (small plastic containers) of crack cocaine, and three loaded handguns.

An agent of the FBI gave expert testimony that the observations of Det. Ellis and the other officers were consistent with methods used by street-level drug dealers. Guns, he said, would be used in connection with such an operation to protect the stash and maintain a territory. Transactions would typically be done in cash, and small bills may periodically be traded in for larger ones at local businesses.

The government, by stipulation, later introduced evidence that each of the defendants had a prior felony conviction.

The defense put on a case, although the defendants themselves did not testify. The defense case, however, rested on the testimony of witnesses closely identified with Tullies, or who were readily impeachable on other grounds.

Defendant Tullies's daughter and her best friend testified that they went to the block to meet Tullies, who was to give her some money for shoes. Tullies pulled up in a car, she said, but was quickly arrested.

John Potts, the driver of the green Civic, testified that he bought the drugs, not from Tullies and Williams, but from two "younger kids"—described as skinny African-American males, 6 feet in height, around 18 to 20 years old. There was no evidence that anyone else, including the police and three defense witnesses who had been parked on the block, observed those males in the area. Potts was impeached as a heroin addict with a criminal record. The government also elicited that he had spoken freely to representatives of the defense, but had refused to speak to the government. Potts was "100% sure" (Tr. 478) of his

testimony that others had sold him drugs, but did not recognize a photo of the officer who arrested him.[19]

Most pertinently, however, the evidence suggested that Potts was, or at least would naturally have felt, intimidated. He was arrested and placed in a cell with the defendants. He learned that they were accused of being drug dealers who had possessed loaded guns. He testified that he knew drug dealers were dangerous. His reluctance to testify against them would have been natural—and there was more specific evidence of intimidation.

Dina Blackwell, who identified Tullies as her fiancé, testified in a manner that would have permitted the jury to infer that she had put tacit pressure on Potts. She admitted to speaking to both defendants since their arrest and arranging conference calls between them. She admitted on cross-examination[20] that Tullies asked her to find Potts and contact him online, and that he directed her "multiple times" to attend Potts's court appearances and speak to him about the case. She admitted that Tullies directed her to "write up what John Potts should say," and directed her to take a photo of John Potts's identification. Still, she said initially, she "never spoke to Mr. Potts." She also testified that she did not see Potts at an initial municipal court appearance, but only at a second one, in the company of an investigator. (Tr. 486–87)

---

[19]     The jury, not the court, was the finder of fact. In assessing the strength of the case, however, I consider that Mr. Potts's demeanor was not very credible. Although adamant that persons other than the defendants had sold him the drugs, he was fairly easily led on other matters. On direct examination, Potts testified that he did not recognize a photo of the officer who arrested him (Tr. 453–54), but backtracked on cross-examination: "Okay. Yeah. . . . Well, probably." (Tr. 462) He testified that he had never met Tullies or his family, but backtracked and admitted that statement had not been truthful: "Okay. Yeah." (Tr. 470) He then said he had met Dina Blackwell only at his first court appearance, but later agreed with his questioner that he met her again, in the company of an investigator, at a second court appearance. (Tr. 478)

[20]     She had little choice. The government had in its possession tape recordings of the relevant telephone calls. To avoid the prejudice of playing jailhouse calls, I directed the government to avoid referring to them unless it was necessary to impeach Ms. Blackwell as to their contents. (Tr. 489–90) Although the government had proffered the calls in evidence, it withdrew that request after Dina Blackwell admitted the essentials on cross-examination. (Tr. 496)

Confusingly, she backtracked, admitting that at his first court appearance, she "pulled Potts aside" and spoke to him outside of court in the company of her daughter, to whom he gave his contact information. (Tr. 493–94)

The evidence of guilt, then, was quite strong, and the testimony for the defense was readily discredited.

*  *  *

In short, the prosecutor's comment in summation, even if inappropriate, was not inflammatory or egregious; it was more a matter of implication. The jury surely voted to convict based on the government's persuasive evidence, not on some inference of uncharged activity from the prosecutor's summation. In addition, any rhetorical suggestion of drug dealing beyond what was observed on October 4, 2017 was harmless, given the strong evidence that defendants possessed literally hundreds of doses of narcotics, as well as tools of the narcotics trade. The jury could not be shielded from that. And finally, the jury was forcefully instructed that the defendants were on trial for the events of October 4, 2017, and only for those events. They are presumed to have followed those instructions, and the surrounding circumstances do not suggest that they would have had any difficulty in doing so.

The motion for a new trial pursuant to Fed. R. Crim. P. 33 is therefore denied.

## CONCLUSION

Individually, the defendants' claims of error do not raise a substantial possibility of prejudice. Taken together, they likewise do not suggest prejudice, unfairness, or evidentiary insufficiency that would warrant a new trial or judgment of acquittal. For the foregoing reasons, the post-trial motion of defendant Jesse Tullies (DE 69), joined by defendant Eugene Williams (DE 72), for a judgment of acquittal, pursuant to Federal Rule of Criminal Procedure

29(c), or for a new trial, pursuant to Federal Rule of Criminal Procedure 33, is denied. An appropriate Order will be filed with this Opinion.

Dated: November 14, 2018

**KEVIN MCNULTY**
**United States District Judge**